******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ECKER, J. concurring in part and concurring in the judgment. Writing for the plurality, my colleague, Justice McDonald, reads the term "municipal clerk" in General Statutes § 9-140b (c) (2) to plainly and unambiguously mean the municipal clerk or the clerk's designees. In his concurrence, my equally learned colleague, Justice D'Auria, reads the same language to plainly and unambiguously mean the municipal clerk or an assistant clerk authorized pursuant to General Statutes § 7-19, and no one else. Reasonable minds will differ on many subjects, and even respected jurists with expertise in statutory construction will sometimes disagree about when a reading of a statute has strayed beyond the limits of plausibility. In the present case, I am convinced that both of my colleagues advance reasonable interpretations of § 9-140b (c) (2). At the end of the day, one interpretation must be wrong and the other right, but neither side is so clearly right or wrong that no room for doubt remains regarding who exactly is authorized to retrieve absentee ballots from drop box locations. "[M]ore than one reasonable interpretation of a statute" is the very definition of ambiguity under our case law. *Ledyard* v. *WMS Gaming, Inc.*, 338 Conn. 687, 698 n.6, 258 A.3d 1268 (2021). Under these circumstances, I see great benefit, and no conceivable harm, in looking at extratextual evidence that would help resolve our interpretive impasse. Indeed, General Statutes § 1-2z[1] contemplates precisely that approach.

I am ultimately persuaded that the interpretation of § 9-140b (c) (2) adopted by the plurality is correct, only after considering the 2021 amendment of the statute and related legislative history. I therefore agree with and join parts II through VI of the plurality opinion and concur in the result reached in part I.

I

My colleagues and I disagree about whether § 9-140b (c) (2) is ambiguous. Ambiguity matters because § 1-2z prohibits a court from considering legislative history and other extratextual evidence unless the statutory meaning is ambiguous or the unambiguous meaning yields absurd or unworkable results. Section 1-2z prescribes a two step process for statutory interpretation. In the first step, we attempt to ascertain the meaning of the statute as applied to the facts of the case, without the benefit of extratextual sources of legislative intent. To do this, we try to derive "the apparent intent of the legislature" from the text itself, considering the broader legal and practical context. (Internal quotation marks omitted.) *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 83, 282 A.3d 1253 (2022). If that process reveals a single, clear answer, then our task is complete. If, however, step one produces more than one plausible

interpretation, or if the plain and unambiguous meaning yields absurd or unworkable results, then we may move on to step two.

In step two, we are permitted to consider legislative history and similar materials, which we are required to set aside in part one. In this way, § 1-2z limits the role of legislative history in statutory interpretation. By curtailing our use of legislative history, § 1-2z prevents overreliance on remarks by legislators or others that may not be the most reliable guide to what the legislature intended. As the legislature knows better than we do, legislative history is a far from perfect guide to legislative intent. The best evidence of the purpose of a statute is the language passed into law, not the stray remarks of individual legislators or persons testifying at legislative hearings.

This case is unusual because the court has produced two divergent opinions, each implicitly but necessarily claiming to offer the *only* reasonable interpretation of the same statutory provision. The plurality concludes that the term "municipal clerk" unambiguously means "the clerk or the clerk's designee." I disagree because I think it is at least reasonable to conclude, as the plaintiff, Barry Lee Cohen, argues, and as Justice D'Auria believes, that "municipal clerk" means simply "municipal clerk" and (unless the assistant clerk's role is activated under § 7-19)[2] nothing more. That is how the term is defined in the statutory scheme that governs absentee voting, of which § 9-140b (c) (2) is a part. See General Statutes § 9-1 (g) (defining "municipal clerk" as "the clerk of a municipality"); General Statutes § 9-1a (defining "municipal clerk" as "the town clerk in or for the municipality to which reference is made"). I cannot accept that a literal reading of the statute is not even plausible in these circumstances.

The existence of a plausible alternative interpretation is enough to create ambiguity. "[A]lthough there must be more than one reasonable interpretation of a statute in order for it to be considered ambiguous, those interpretations need not be necessarily strong or have a high probability of success. Put differently, a statute is plain and unambiguous when the meaning . . . is so strongly indicated or suggested by the [statutory] language . . . that . . . it appears to be *the* meaning and appears to preclude any other likely meaning. . . . [I]f the text of the statute at issue . . . would permit more than one likely or plausible meaning, its meaning cannot be said to be plain and unambiguous." (Emphasis in original; internal quotation marks omitted.) *Ledyard* v. *WMS Gaming, Inc.*, supra, 338 Conn. 698 n.6. For this reason, among others, I believe that § 9-140b (c) (2) is ambiguous and would proceed to consider legislative history before reaching a decision about what the statute means as applied to the facts of this case.

In fairness to the plurality, the statutory language is

not as straightforward as it appears. It might seem obvious that "municipal clerk" simply means "municipal clerk," but statutory interpretation is not an abstract exercise in stringing together dictionary definitions. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature . . . as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Wind Colebrook South, LLC* v. *Colebrook*, 344 Conn. 150, 161, 278 A.3d 442 (2022). The present case illustrates how the literal meaning of a term (the "municipal clerk," as the person) may become so intertwined and even conflated with a different meaning (the "municipal clerk," as the *office* of the municipal clerk, including its employees) that it is difficult to know which of the two different meanings was intended.

"As required by § 1-2z, we must determine whether this statutory language is ambiguous. The test to determine ambiguity is whether the statute, *when read in context*, is susceptible to more than one reasonable interpretation." (Emphasis added; internal quotation marks omitted.) Id., 165; see *King* v. *Burwell*, 576 U.S. 473, 486, 135 S. Ct. 2480, 192 L. Ed. 2d 483 (2015) ("oftentimes the meaning— or ambiguity—of certain words or phrases may . . . become evident [only] when placed in context" (internal quotation marks omitted)). Both the plurality and Justice D'Auria give substantial weight to commonsense and practical considerations about the operation of a municipal clerk's office, the feasibility of single-handedly retrieving all absentee ballots, and prevailing concerns about the integrity of our elections in connection with absentee voting. The application of practical wisdom in this manner is perfectly appropriate. "[C]ourts should not construe statutes in disregard of their context"; (internal quotation marks omitted) *State* v. *Banks*, 321 Conn. 821, 842, 146 A.3d 1 (2016); and "there is no canon against using common sense . . . ." *Roschen* v. *Ward*, 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929). This court repeatedly has held that the threshold ambiguity analysis under § 1-2z should and must take into account these commonsense, practical considerations regarding how the statutory scheme will operate in the real world. See, e.g., *Seramonte Associates, LLC* v. *Hamden*, supra, 345 Conn. 91 (relying on practical considerations in determining whether statute was plain and unambiguous); *Casey* v. *Lamont*, 338 Conn. 479, 493, 258 A.3d 647 (2021) (considering commonsense implications of statutory construction before resorting to extratextual sources to glean legislature's intent); *Planning & Zoning Commission* v. *Freedom of Information Commission*, 316 Conn. 1, 18 n.13, 110 A.3d 419 (2015) (considering whether proffered construction of statute "would belie common sense" in assessing ambiguity).

The difference between my view and the views of my colleagues is that these contextual considerations only strengthen my conviction that the term "municipal clerk," as used in § 9-140b (c) (2), is ambiguous. The term might

plausibly mean "the clerk or the clerk's designee," but it might also plausibly mean the clerk alone (or the assistant clerk if the requirements of § 7-19 are met). The plurality relies on three arguments to arrive at the conclusion that, despite first appearances, the operative language plainly and unambiguously permits the clerk's authorized designee to retrieve the absentee ballots. See part I of the plurality opinion. I find these arguments to be, for the most part, persuasive enough to create ambiguity regarding the meaning of § 9-140b (c) (2). I do not agree, however, that they render the alternative reading so unreasonable that there is no need to consult the legislative history.

First, the plurality contends that the reference to the municipal clerk in § 9-140b (c) (2) must include the clerk's designee because § 7-19 allows the municipal clerk to delegate responsibilities.[3] This point achieves only limited traction. Section 7-19, by its express terms, applies only to "assistant town clerks" who have "taken the oath provided for town clerks . . . ." No other persons are authorized by § 7-19 to act for the municipal clerk. The record in the present case reveals that only one of the three individuals who retrieved absentee ballots at the clerk's request was an assistant town clerk and, thus, a permitted designee under § 7-19.[4] Additionally, an assistant town clerk has "all the powers and [may] perform all the duties of the town clerk" only if the town clerk is absent or unable to perform his or her duties. General Statutes § 7-19. With one exception, there is no evidence in the present case to indicate that, on each of the dates that the absentee ballots were collected from drop boxes, the town clerk was absent or otherwise unable to perform her duties.[5] The fact that § 7-19 expressly authorizes the town clerk to delegate her duties to a duly appointed assistant clerk plainly does not demonstrate that § 9-140b (c) (2) permits an unfettered delegation of duties. Indeed, it could be argued that, by expressly providing for a limited delegation of authority, the statutory scheme prohibits any other delegation of authority except in accordance with the constraints of § 7-19. See, e.g., *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 194, 128 A.3d 901 (2016) ("[u]nder the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—we presume that when the legislature expresses items as a group or series, an item that was not included was deliberately excluded").

Second, the plurality argues that subsection (d) of § 9-140b contemplates that someone other than the town clerk will receive and process absentee ballots. I disagree. Subsection (d) of § 9-140b provides in relevant part that "[n]o person shall have in his possession any official absentee ballot or ballot envelope . . . except . . . *any person authorized by a municipal clerk to receive and process official absentee ballot forms on behalf of the municipal clerk*, any authorized primary, election or referendum official or any other person authorized by any provision of the general statutes to possess a ballot or

ballot envelope." (Emphasis added.) This subsection makes possession of an official absentee ballot or ballot envelope unlawful, with an exception for, among others, any persons authorized to "receive and process" the absentee ballots on behalf of the clerk. The provision says nothing about *who* is authorized "to receive and process official absentee ballot forms" but merely states that only persons so authorized may be in possession of the ballots.[6] General Statutes § 9-140b (d).

Finally, the plurality reasons that the legislature must have intended to permit a municipal clerk to delegate the duty to retrieve absentee ballots from drop boxes because the clerk has many other statutory responsibilities relating to absentee voting, and it is implausible that the legislature intended to impose such manifold and onerous responsibilities on a single public official without the ability to delegate. This is a good and persuasive argument, but in no way does it remove the ambiguity from the statute. Instead, it gives rise to ambiguity or adds to its presence.

It is at least plausible that the language the legislature employed was intended to establish a strict procedure for handling absentee ballots. Section 9-140b (c) (2) is part of chapter 145 of title 9 of the General Statutes, which governs absentee voting procedures. See General Statutes § 9-133f. These statutes establish mandatory procedural requirements to protect against fraud and corruption in the use of absentee voting. See *Keeley* v. *Ayala*, 328 Conn. 393, 411, 179 A.3d 1249 (2018). The procedural requirements are exacting, extensive, and detailed. See generally General Statutes § 9-133f et seq.[7] They cover the entire life cycle of the balloting process, including eligibility and application procedures for absentee voters; printing, form and inspection procedures for absentee ballots; distribution, execution, handling, processing, tabulation and accounting procedures for the ballots; and more. Specific statutory provisions include elaborate requirements governing the chain of custody of these ballots to ensure that the absentee voting process, which, by definition, occurs outside of the controlled environment of regular voting locations, is not corrupted—whether accidentally or intentionally—by mishandling, meddling or any other irregularity. "[T]he procedures required by the absentee voting laws serve the purposes of enfranchising qualified voters, preserving ballot secrecy, preventing fraud, and achieving a reasonably prompt determination of election results . . . . This court previously has recognized that there is considerable room for fraud in absentee [ballot] voting and that a failure to comply with the regulatory provisions governing absentee [ballot] voting increases the opportunity for fraud." (Internal quotation marks omitted.) *Keeley* v. *Ayala*, supra, 407. In this context, it strikes me as at least reasonable to construe § 9-140b (c) (2), as the plaintiff and Justice D'Auria do, to mean that the legislature intended the municipal clerk, and no one else,[8] to personally carry out particular duties relating to absentee ballots.[9]

I do not claim that the plurality is wrong about the meaning of § 9-140b (c) (2). The plurality's interpretation is textually plausible and entirely sensible in the context of the facts and the larger statutory scheme. My point simply is that this is not the *only* reasonable reading of the statute, for the reasons that I have explained. In § 1-2z terms, the statutory meaning that the plurality ascertains from the operative text and statutory context is not plain and unambiguous. As a consequence, I would proceed, as I do in part II of this opinion, to consider extratextual evidence to the extent it illuminates the legislative intention behind the relevant statutes.

II

Section 9-140b (c) (2) was amended during a special session in June, 2021. See Public Acts, Spec. Sess., June, 2021, No. 21-2, § 102 (Spec. Sess. P.A. 21-2).[10] The prior version of the statute provided in relevant part: "In the case of absentee ballots mailed under subparagraph (B) of subdivision (1) of this subsection . . . the municipal clerk shall (A) retrieve from the secure drop box described in said subparagraph each such ballot deposited in such drop box, and (B) *if the drop box is located outside a building other than the building where the clerk's office is located, arrange for the clerk or the clerk's designee to be escorted by a police officer during such retrieval.*" (Emphasis added.) General Statutes (Rev. to 2021) § 9-140b (c) (2). Thus, the statute, in its current form, was amended to delete the reference to the "clerk's designee" and a police escort during the retrieval of absentee ballots from certain drop boxes. The deletion of the "clerk's designee" from § 9-140b (c) (2) would seem to support the plaintiff's argument that the legislature intended only for the municipal clerk, and no one else, to retrieve absentee ballots from drop boxes. A closer look at the relevant legislative history, however, is instructive regarding the reason for this statutory amendment and undermines the plaintiff's claim.

As the trial court, *Wilson, J.*, observed in her comprehensive memorandum of decision, the purpose of this statutory amendment "was twofold: (1) to make the absentee ballot drop boxes permanent; and (2) to delete the requirement that a police officer accompany the clerk or the clerk's designee when [he or she] retrieve[s] ballots from a drop box other than the one located outside the municipal clerk's office building." As recounted by the trial court, former Secretary of the State Denise W. Merrill testified during a March 10, 2021 hearing of the Government Administration and Elections Committee about the purpose of the proposed amendment:[11] " 'Its purpose is to make the administration of elections easier for local officials and [to] make navigating that administration easier for voters. . . . The secure absentee ballot drop box provision would make these drop box[es] . . . a permanent convenient

part of Connecticut elections.' [Conn. Joint Standing Committee Hearings, Government Administration and Elections, 2021 Sess. (March 10, 2021) pp. 18–19, remarks of Secretary of the State Merrill.] Representative [Gale] Mastrofrancesco later asked whether a police escort would need to accompany the town clerk to retrieve absentee ballots from the drop box. Id., [p.] 29. Merrill responded: '[W]e [have] consulted with the town [clerks] and we asked them . . . do you think this is necessary because essentially, this is a job for the town [clerks], it's a way of making their jobs easier frankly. . . . You know there's a vast variety of towns in the state, so they told us they didn't think it was necessary, that they thought they were capable of doing it without the police presence, [that they] had absolutely no problems with the ballot boxes . . . .' Id. [pp. 29–30.]

"Representative Mastrofrancesco then specifically asked Merrill: '[S]o the town clerk will be responsible for picking up the ballots, [does it have] to be the town clerk specifically picking up the ballots out of the box or can [he or] she just send . . . anybody [there] to pick them up.' Id., [p.] 30. Merrill responded: 'I believe the town clerk[s] [have] to do that themselves, I mean . . . either a town clerk or designee of the town clerk, they can designate certainly I'm sure they have assistance and all kinds of people in their office [who] would be available to pick them up.' Id. Representative Mastrofrancesco replied: '[S]o pretty much anybody [who] works for the town [he or] she can really designate anybody to go pick up those ballots.' Id. Merrill responded: 'Yes, well similar to, they could send somebody to the mail room to pick up the ballots from the mail to[o] same idea. Ballot boxes are treated exactly like mailboxes essentially.' Id."

On the basis of the foregoing legislative history and the practical difficulties identified by the plurality, I agree with the trial court that "the legislature's purpose [in] amending § 9-140b (c) (2) was to make the drop boxes permanent for future elections and to omit the requirement that a police officer escort the town clerk or her employees when retrieving absentee ballots from drop boxes around the town or city. There is no indication that the amendment's purpose was to require that only the municipal clerk herself retrieve the absentee ballots from the drop boxes." The legislative history thus confirms the plurality's construction of the statute and illustrates that the appropriate use of extratextual evidence will serve to effectuate (rather than undermine) the legislative will. Because I agree with the plurality that the municipal clerk was permitted under § 9-140b (c) (2) to designate municipal employees within her office to retrieve absentee ballots from the secure drop boxes on her behalf, I concur in the result reached in part I of the plurality opinion.

[1] General Statutes § 1-2z provides that "[t]he meaning of a statute shall,

in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[2] A duly appointed assistant clerk may, under specified circumstances, perform the duties of the municipal clerk pursuant to § 7-19. See footnote 3 of this opinion. Justice D'Auria and I agree that § 7-19 provides authority for a duly appointed assistant clerk to retrieve absentee ballots from a drop box only if the municipal clerk is absent or unable to perform those duties. See footnote 5 of this opinion.

[3] General Statutes § 7-19 provides in relevant part: "Each town clerk may, unless otherwise provided by charter or ordinance, appoint assistant town clerks, who, having taken the oath provided for town clerks, shall, in the absence or inability of the town clerk, have all the powers and perform all the duties of the town clerk. . . ."

[4] Sharon Recchia was designated as an assistant clerk, and she retrieved some of the absentee ballots cast in the 2022 election. Municipal employees Jasmine Acevedo and Lori Moran also retrieved absentee ballots. There is no evidence that either Acevedo or Moran was an authorized delegee under § 7-19.

[5] The municipal clerk was not present in the clerk's office on election day, and, therefore, I agree with the plurality that "the retrieval of ballots from the drop boxes on election day by an assistant clerk would plainly be permissible under § 7-19 . . . ." Footnote 5 of the plurality opinion.

[6] Even if, for the sake of argument, subsection (d) of § 9-140b were construed as an implied grant of authority, the specific action authorized is "receiv[ing] and process[ing]" absentee ballots, not "retriev[ing]" absentee ballots from a drop box, which is the particular conduct referenced in § 9-140b (c) (2).

[7] See, e.g., General Statutes § 9-135b (form, layout and inspection protocols for absentee ballots); General Statutes § 9-137 (oath and inner envelope for ballot); General Statutes § 9-138 (outer envelope for ballot and inner envelope); General Statutes § 9-139a (Secretary of the State's obligations regarding provision to municipal clerks of ballots, envelopes and instructions); General Statutes § 9-139c (municipal clerk accountability and reporting requirements); General Statutes § 9-140 (application for and issuance of absentee ballots, distribution of absentee ballot applications, mailing unsolicited absentee ballot applications, and summary of absentee ballot voting laws); General Statutes § 9-140a (singing of form and insertion of absentee ballot in envelopes); General Statutes § 9-140b (return of absentee ballots and restrictions on possession of absentee ballots and envelopes); General Statutes § 9-140c (sorting of absentee ballots and checking of names on registry list, rejection of absentee ballots, times for delivery of ballots, and retention of late ballots).

[8] Again, this means no one else except for a duly appointed assistant clerk acting pursuant to § 7-19.

[9] The plaintiff and Justice D'Auria follow different paths to reach the same conclusion. Their positions also differ in that the plaintiff, unlike Justice D'Auria, does not contend that the statutory meaning that he promotes is plain and unambiguous. Although I agree with aspects of Justice D'Auria's concurring opinion, I disagree in two respects: (1) I do not consider the statute to be plain and unambiguous; and (2) I find the plurality's interpretation of the statute marginally more persuasive as it relates to who may retrieve the ballots.

[10] The plurality appears to consider the prior version of the statute to be extratextual evidence of legislative intent. See part I of the plurality opinion. Justice D'Auria indicates agreement with that view. See footnote 2 of Justice D'Auria's concurring opinion. That position is open to doubt. Compare *Chestnut Point Realty, LLC* v. *Windsor*, 324 Conn. 528, 537–38, 153 A.3d 636 (2017) (treating statutory genealogy as extratextual evidence), *Donahue* v. *Veridiem, Inc.*, 291 Conn. 537, 546 n.8, 970 A.2d 630 (2009) (§ 1-2z "permits resort to extratextual sources, such as amendments to the statute, [only] after there is a determination that the text is ambiguous"), and *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 112, 942 A.2d 396 (2008) ("[because] the statute yields no plain meaning . . . we turn to [its] genealogy and legislative history . . . to answer the issue raised in this appeal"), with *Housatonic Railroad Co.* v. *Commissioner of Revenue Services*, 301 Conn. 268, 305, 308, 21 A.3d 759 (2011) (considering "the genealogy of the statute" in determining whether statute was plain and unambiguous under § 1-2z).

For present purposes, however, I will assume, for the sake of argument, that both the prior text of the statute and its legislative history should be treated as "extratextual evidence" under § 1-2z.

[11] The public hearing was on Senate Bill No. 1017, which contained the same statutory amendment ultimately enacted in § 102 of Spec. Sess. P.A. 21-2 during the legislature's special session in June, 2021. Like the trial court, I find the legislative history of Senate Bill No. 1017 to be illustrative of the legislative intent animating § 102 of Spec. Sess. P.A. 21-2.

_____